**[J-94A-2024 and J-94B-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 35 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Superior Court |
| | : | Order dated June 26, 2023 at No. |
| | : | 115 EDA 2022 Affirming the |
| v. | : | Philadelphia County Court of |
| | : | Common Pleas November 15, 2021 |
| | : | Judgment of Sentence at No. CP- |
| JAMES SMITH, | : | 51-CR-0002286-2020 |
| | : | |
| Appellant | : | ARGUED:  November 20, 2024 |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 36 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Superior Court |
| | : | Order dated June 26, 2023 at No. |
| | : | 116 EDA 2022 Affirming the |
| v. | : | Philadelphia County Court of |
| | : | Common Pleas November 15, 2021 |
| | : | Judgment of Sentence at No. CP- |
| JAMES SMITH, | : | 51-CR-0001692-2021 |
| | : | |
| Appellant | : | ARGUED:  November 20, 2024 |

## OPINION

**JUSTICE DONOHUE**                                    **DECIDED: September 25, 2025**

This appeal involves a trial court's refusal to inquire of a jury panel in a child sexual assault case about any fixed bias in favor of the truthfulness of a child victim.  Prior to trial in these consolidated child sexual assault cases, appellant James Smith ("Smith") submitted, among others, the following proposed question for jury voir dire: "Are you more likely to believe the testimony of a child alleging sexual abuse because you do not believe

a child could lie about sexual abuse?" Smith's Requested Supplemental Oral Juror Questions, ¶ 2. The trial court refused to pose the question to the venire. However, it informed all prospective jurors about the charges and asked if anything about the nature of the charges would prevent them from being fair and impartial, N.T., 6/22/2021, at 21-22; asked prospective jurors whether they or anyone close to them had been victims of sexual assault or child abuse, *e.g., id.* at 32-34; and whether they worked or volunteered with any kind of domestic violence or sexual assault organization, *e.g., id.* at 62. Smith proceeded to trial where he was convicted of all counts with regard to both victims: rape of a child, unlawful contact with a minor, corruption of minors, involuntary deviate sexual intercourse ("IDSI") with a child, and aggravated indecent assault of a person less than thirteen years of age.[1] On appeal, Smith argued that the trial court erred in refusing the specific voir dire question regarding the potential bias in favor of the trustworthiness of a child victim in a sexual assault case. He further argued that the evidence was insufficient to support his convictions for unlawful contact with a minor. In challenging the sufficiency of the evidence, Smith insisted that his contact with the minors was not the type of pre-assault communication envisioned by Section 6318 of the Crimes Code. The Superior Court rejected both challenges and affirmed his judgment of sentence. *Commonwealth v. Smith*, 2023 WL 4174154 (Pa. Super. June 26, 2023) (non-precedential decision).

We granted review to address two questions:

> (1) In a sex abuse case where the uncorroborated testimony of two child complainants was at issue, did the Superior Court err by holding [Smith] had no right to ask prospective jurors if they held a fixed belief that children would not lie about being sexually abused, contrary to this Court's decisions holding

---

[1] 18 Pa.C.S. §§ 3121(c), 6318(a)(1), 6301(a)(1)(ii), 3123(b), 3125(a)(7).

that an inquiry into prospective jurors' potential bias as to the trustworthiness of certain categories of witnesses is necessary on voir dire?

(2) Has the Superior Court, contrary to the terms of the statute and the intent of the legislature, impermissibly expanded the scope of criminal liability of 18 Pa.C.S. § 6318, unlawful contact with a minor?

*Commonwealth v. Smith*, 316 A.3d 620 (Pa. April 9, 2024) (per curiam).[2]  We conclude that on the record presented, the trial court did not abuse its discretion in refusing to voir dire the jury panel on the question proposed by Smith.  On the second issue, we vacate the judgment of the Superior Court and remand for reconsideration in light of our decision in *Commonwealth v. Strunk*, 325 A.3d 530 (Pa. 2024).

I.    **Voir Dire**

During voir dire, the trial court informed the venire about the nature of the charges,[3] then asked whether there was "anything about the nature of this case that would prevent

_____

[2]  Pursuant to our order, the first issue was argued consecutive to *Commonwealth v. Walker*, __ A.3d __, 2025 WL 2402237 (Pa. Aug. 19, 2025), and the second issue was submitted on the briefs.

[3] The court stated:

> [T]he defendant has been charged with the following crimes: criminal attempt of involuntary deviate sexual intercourse of a child; unlawful contact with a minor; corruption of a minor; rape of a child; involuntary deviate sexual intercourse with a child; rape of a child; involuntary deviate sexual intercourse with a child; unlawful contact with a minor; corruption of minors; aggravated indecent assault with a person less than 13 years of age.
>
> And the allegations are such that the Commonwealth alleges that between January 1st 2018 through March 19, 2020 inside a residence located … in … Philadelphia … the defendant sexual assaulted the complainants [M.B.] and [A.G.], his friend's daughters, when they were between the ages of six and eight years old.

N.T., 6/22/2021, at 20-21.

[prospective jurors] from being fair and impartial[.]" N.T., 6/22/2021, at 21. Upwards of twenty prospective jurors answered in the affirmative. *Id.* at 22. The trial court instructed the panel that they would "be asked to evaluate the credibility of the testimony of witnesses as to their truthfulness and accuracy[,]" and to "use the same standard for everyone, regardless of a person's status of [sic] what they do for a living." *Id.* at 15. Thereafter, the trial court conducted individual voir dire based on responses to the questionnaire and oral questions.

Smith requested that the trial court ask prospective jurors: "Are you more likely to believe the testimony of a child alleging sexual abuse because you do not believe a child would lie about sexual abuse?" Smith's Requested Supplemental Oral Juror Questions, ¶ 2. Smith did not offer any argument to support the underlying proposition that child victims of sex abuse are generally perceived to be more trustworthy. The trial court refused to ask the question because it considered it to be essentially a question of witness credibility, and because the question was intended to ascertain how prospective jurors would weigh the main witnesses' testimony. Trial Court Opinion, 6/1/2022, at 11 (internal citation omitted).

Though it did not ask Smith's proposed question regarding potential bias in favor of child victim witnesses, the trial court otherwise conducted individual voir dire on the jurors' experience with child sex abuse.[4] During individual voir dire, the trial court inquired

---

[4] Pertinent to the appeal, Smith requested five supplemental questions:

> 1. Have you or anyone you know ever been the victim of sexual assault or domestic violence even if it was not reported to police and/or no one was arrested?
>
> 2. Are you more likely to believe the testimony of a child alleging sexual abuse because you do not believe a child could lie about sexual abuse?

(continued…)

into specific instances of child abuse and sexual assault of persons close to them; it asked jurors whether their experiences would interfere with their ability to be fair; and it dismissed multiple jurors for cause based on their answers.[5] During this process, the trial court asked, per Smith's request, whether prospective jurors "worked or volunteered for a domestic violence and/or sex abuse organization[.]"  N.T., 6/22/2021, at 78.  At least one prospective juror indicated that the juror did work in such an organization but that the experience would not impact that juror's ability to be fair and impartial.  *Id.* at 106.

---

> 3. Do you currently or have you in the past worked or volunteered for any organizations that help victims of domestic or sexual abuse?
>
> 4. If so, which organization(s) and in what capacity did you work/volunteer?
>
> 5. Would that experience in any way impact your ability to be fair and impartial in this case? If so, how?

Smith's Requested Supplemental Oral Juror Questions, ¶¶ 1-5.  Only question number two specifically referenced child sex abuse.  The trial court asked the potential jurors specifically whether the juror or anyone close to the juror had been the victim of sexual assault or child abuse, a question which the Commonwealth proposed.  *See* Commonwealth's Pre-Trial Memorandum, at 2.

[5]  *See, e.g.*, N.T., 6/22/2021, at 32-34 ("Have you or anyone close to you ever been a victim of a sexual assault or child abuse … whether or not it was reported?"); *id.* at 36 (excusing for cause a juror whose "gut instinct" would interfere with the juror's ability to be fair); *id.* at 41 (excusing a juror for cause who indicated an inability to be fair because of the nature of the charges and felt a visceral reaction to the charges); *id.* at 47-48 (excusing a juror for cause who indicated uncertainty about the juror's ability to render a fair and impartial verdict); *id.* at 57 (same); *id.* at 80-81 (excusing a juror for cause who indicated that, based on the nature of the allegations, the juror could not be fair and this trial would make the juror's blood pressure go up); *id.* at 93 (excusing a juror for cause who stated "I don't know" when asked whether the juror could come in with an open mind and render a fair and impartial verdict); *id.* at 101 (excusing a juror for cause who had been sexually assaulted and stated it was hard for the juror to be there); *id.* at 122-23 (excusing a juror for cause who stated that it would be a "disservice to the person that is here charged" because the juror could not be fair); *id.* at 126-27 (excusing a juror for cause who could not separate the juror's own sexual assault from the charges involved).

On appeal to the Superior Court, Smith raised two issues. First, he argued that the trial court erred in refusing to ask the jury the question regarding whether prospective jurors would be more likely to believe the testimony of a child alleging sexual abuse because they do not believe that a child could lie about sex abuse. The Superior Court stated that Smith's proposed question, "wholly involved the victims' credibility, was essentially argumentative, and impermissibly sought to gauge jurors' receptiveness to possible defense strategies." *Smith*, 2023 WL 4174154, at *3 (citing, inter alia, *Commonwealth v. Paolello*, 665 A.2d 439, 451 (Pa. 1995) (finding no error in trial court's refusal to permit questions regarding prospective jurors' "opinions, attitudes, and involvement with alcohol" in first degree murder prosecution where defense was that victim died solely of alcohol poisoning)). The Superior Court highlighted the thorough voir dire questioning about prospective jurors' ability to be impartial, the trial court's instructions regarding credibility, and Smith's failure to cite "any authority mandating that courts ask prospective jurors whether they believe a victim of a particular category of a crime could lie[.]" *Id.*

For his second issue, Smith argued that the evidence was insufficient to support his convictions for unlawful contact with a minor because his contact with the minors was not the type of pre-assault communication envisioned by Section 6318 of the Crimes Code. The Superior Court disagreed, finding that Smith's statements asking the victims' to perform oral sex on him and instructing them "demonstrate the type of communication contemplated by the statute." *Id.* at *4.

**Parties' Arguments**

On appeal to this Court, Smith, for the first time, develops a comprehensive argument in support of the proposed voir dire question.[6] Smith contends that the trial court's refusal to inquire into "child victim trustworthiness bias" violated his right to a fair trial and impartial jury. Smith's Brief at 1. In asserting that his proposed question was necessary to determine whether potential jurors would be unable to evaluate the evidence fairly and impartially, Smith relies on case law supporting inquires related to recognized societal biases citing instances where the Court has found error in a trial judge's refusal to ask questions about bias concerning race, and where the Superior Court affirmed questioning regarding attitudes about homosexuality when it was central to the case. Smith's Brief at 14 (citing *Commonwealth v. Brown*, 347 A.2d 716, 718 (Pa. 1975) *overruled, in part, by Commonwealth v. Richardson*, 474 A.2d 1361 (Pa. 1984); *Commonwealth v. Christian*, 389 A.2d 545 (Pa. 1978); *Commonwealth v. Miller*, 897 A.2d 1281, 1289 (Pa. Super. 2006)). He maintains that where, because of societal prejudice, jurors have "a predisposition to believe or disbelieve the testimony of particular witnesses simply because they fall into a particular category[,]" further exploration is warranted. *Id.* at 15. By comparison, Smith highlights our jurisprudence regarding bias toward law enforcement, such as *Commonwealth v. Futch*, 366 A.2d 246 (Pa. 1976), where this Court found error in the trial court's failure to probe the venire regarding potential bias toward corrections officers and against prison inmates in a case involving a prison-yard stabbing of one prisoner by another. Smith's Brief at 16 (citing *Futch*, 366 A.2d at 250).

---

[6] Before the Superior Court, Smith did not justify his assumption that jurors harbor fixed beliefs about the truthfulness of child sex abuse victims. He merely stated that the charges and allegations "may carry sufficient emotional impact to render certain jurors incapable of considering the evidence in a fair and unbiased manner," and he asserted, without any citation to support, that "certain jurors may be predisposed to credit" the testimony of "the alleged child victim herself[.]" Smith's Superior Court Brief at 14.

He also cites *Commonwealth v. Ingber*, 531 A.2d 1101 (Pa. 1987), where this Court found that an inquiry into a prospective juror's predisposition to believe a police officer was necessary "to determine this juror's qualification to serve." Smith's Brief at 16 (citing *Ingber*, 531 A.2d at 1104). Smith argues that this analysis is not limited to law enforcement and prisoners. Smith's Reply Brief at 1-3. Instead, he contends, it applies with equal force in child sex abuse cases because they present potentially controversial social issues similar to tort reform and sexual orientation. Smith relates that it is well-known that sex offenders, even those in prison, are considered to be among the most reviled, a circumstance well known across society. *Id.* at 17 n.5.

Smith argues that the documented effect of children's testimony on jurors at such trials supports his assertion that these are equally charged and inflammatory issues. *Id.* at 21. He cites studies of child sex abuse trials to support his claim that "certain jurors are predisposed to credit that testimony simply because of the complainant's tender age." *Id.* at 18-19 (citing, inter alia, Hannah Elias, *Jurors' Perceptions of Child Sexual Abuse Disclosure Patterns* 11 (2022) (M.S. thesis, West Virginia University), https://researchrepository.wvu.edu/etd/11178 (citing Jonathan M Golding, et al., *Improving the Credibility of Child Sexual Assault Victims in Court: The Impact of a Sexual Assault Nurse Examiner*, 33.4 BEHAV. SCI. & L. 493 (2015) (six-year old's testimony, as compared to a fifteen-year old's, resulted in higher credibility ratings and more guilty verdicts)). He also notes cases from other jurisdictions where potential jurors were subject to this type of questioning regarding bias in favor of the trustworthiness of child victims of sex abuse in appeals from denial of for-cause challenges. *Id.* at 20 n.8.

Smith criticizes the Superior Court's suggestion that a proper instruction on credibility is an acceptable substitute for a probing bias inquiry in voir dire. *Id.* at 22-23. He argues that this type of reasoning ignores this Court's determination that specific voir

dire is necessary to determine whether prospective jurors can set aside biases and follow the court's instructions, notwithstanding instructions that followed. *Id.* at 24-25. He also disputes the panel's reliance on the trial court's other general questions regarding the nature of the crime involved and jurors' ability to be fair as substitutes for a specific bias voir dire inquiry. He specifically contests the panel's assertion that the impartiality of the jurors was ensured by the broad question, "Is there anything about the nature of this case that would prevent you from being fair and impartial?" *Id.* at 24 n.9 (citing N.T., 6/22/2021, at 21). Notably, he cites to a Seventh Circuit decision where a nearly identical question posed to the panel was found to be an inadequate inquiry into relevant biases of potential jurors. *Id.* (citing *United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972)). That court did not believe that such a broad question would disclose any disqualifying state of mind, because it did not believe a prospective juror is "so alert to his own prejudice." *Id.* (citing *Dellinger*, 472 F.2d at 367).

Finally, Smith takes issue with the Commonwealth and lower courts' characterization of his inquiry as one improperly seeking to "gauge jurors' receptiveness to possible defense strategies." *Id.* at 25 (citing *Smith*, 2023 WL 4174154, at *3; Smith's Reply Brief at 5-6 (citing Commonwealth's Brief at 10). He argues that this type of analysis would bar any question on voir dire aimed at detecting bias where the trustworthiness of specific witnesses—such as law enforcement officers or prisoners—is critical to the outcome of a case. Smith's Brief at 25. Moreover, his inquiry was aimed at detecting whether prospective jurors held a predetermined fixed opinion, whereas inquiries that have been rejected in other cases were improperly aimed at assessing the efficacy of specific evidence or theories that would potentially be developed at trial. For example, a question was rejected concerning the jurors' views on alcohol usage where

alcohol poisoning was a contested cause of a death[7] or asking if jurors would have a problem with a defendant's flight where evidence of flight was part of the case.[8] Smith contrasts such cases with this case where the question related to a "generic fact" that children would testify to being sexually abused—a fact that the trial judge had already told the prospective jurors. *Id.* at 25-26. In sum, he argues that, in the circumstances of this child sex abuse case where the uncorroborated testimony of the child victims was the crux of the Commonwealth's case, the fundamental purpose of voir dire to produce a fair and impartial jury was undermined by the trial court's refusal to ask the specific question designed to determine whether the jurors had a bias in favor of accepting the testimony of those witnesses. *Id.* at 26-27.

In contrast, the Commonwealth emphasizes that the scope of voir dire rests within the discretion of the trial court and "refusal to permit certain questions … will not be disturbed absent a palpable error." Commonwealth's Brief at 10 (citing *Holt*, 273 A.3d at 547); *see also id.* at 11 (citing *United States v. Tsarnaev*, 595 U.S. 302, 314 (2022) (reversing intermediate appellate court's decision to mandate specific questions on voir dire)). Throughout, it highlights cases where this Court has "rejected efforts to strip the trial court of discretion to determine the propriety of proposed juror questions." *Id.* at 12 (citing inter alia *Commonwealth v. Johnson*, 305 A.2d 5, 8 (Pa. 1973) (affirming trial court's exercise of discretion in declining to question jurors regarding whether they were inclined to believe psychologists)). It maintains that the trial court "was well within its discretion in not allowing this attempt to preview the defense strategy[.]" *Id.* at 10.

Aside from highlighting the standard of review, the crux of the Commonwealth's argument is to accuse Smith of engaging in a "clear attempt to test a potential trial

---

[7] *See, e.g.*, *Commonwealth v. Paolello*, 605 A.2d 439 (Pa. 1995).

[8] *See, e.g.*, *Commonwealth v. Holt*, 273 A.2d 513 (Pa. 2022).

strategy" that the child victims could not be believed. *Id.* The Commonwealth compares this matter to cases where trial courts have denied voir dire questions designed to determine which prospective jurors would be more or less favorably disposed toward the defense strategy. *Id.* at 14. In support, it cites to *Paolello*, 665 A.2d at 451, a first-degree murder prosecution where Paolello planned to present a defense that the victim died of alcohol poisoning and we found no abuse of discretion in the trial court's refusal to ask jurors about their opinions on alcohol use; *Commonwealth v. Bomar*, 826 A.2d 831, 850 (Pa. 2003) where there was no abuse of discretion in refusing to ask the venire its opinions on specific mitigating and aggravating factors; and *Commonwealth v. Biebighauser*, 300 A.2d 70, 75 (Pa. 1973), where refusing to ask the venire about its opinions regarding the intended insanity defense was not an abuse of discretion. The Commonwealth insists that Smith's question is designed to determine whether the jurors will accept his trial strategy that the child victims' testimony could not be believed and in doing so, makes a mockery of voir dire. Commonwealth's Brief at 17 (citing Frank Eamon, *Voir Dire for the Criminal Defense Attorney: Effectively Leveraging the Process for Selecting Supportive Jurors*, JURY SELECTION IN CRIMINAL CASES: LEADING LAWYERS ON BALANCING THE ART AND SCIENCE OF THE VOIR DIRE PROCESS (2013)).

The Commonwealth faults Smith for relying on inapposite cases relating to law enforcement and race and not identifying any cases that require "inquiry into venirepersons' ability to believe or disbelieve a broad class of **victims**[.]" *Id.* at 14 (emphasis in original). Unlike cases involving the plague of racism or the official or semi-official status of certain witnesses that justifies specific inquiry, there are no instances where the courts recognize that a broadly defined group of humans "may be perceived as more or less credible as a class." *Id.* at 15. To the contrary, the Commonwealth states that the United States Supreme Court has not mandated specific inquiries into biases

against broadly defined groups of people, such as persons with beards. *Id.* (citing *Ham v. South Carolina*, 409 U.S. 524 (1973)). Returning to the concept of the broad discretion of a trial court, the Commonwealth highlights that this Court and the United States Supreme Court have favored a trial court's discretion, even in a case involving race. *Id.* (citing *Rosales-Lopez v. United States*, 451 U.S. 182 (1981) (finding no abuse of discretion where the trial court denied inquiry into racial prejudice in a case involving a victim and defendant of the same race)).

Finally, the Commonwealth finds adequate the trial court's specific instructions regarding the credibility of witnesses; the trial court's specific question to prospective jurors as to whether anything about the nature of the allegations would prevent them from being fair and impartial; and the inquiries on the standard questionnaire about the prospective jurors' ability to be fair and impartial. *Id.* at 18 (citing N.T., 6/22/2021, at 15, 21, 41, 50). The Commonwealth maintains that the questions presented to prospective jurors taken together with the instructions adequately protected Smith's right to a fair trial and impartial jury. *Id.*

**Analysis**

It has been said that England "bequeathed to us" certain safeguards for their perpetuation, including the right to trial by jury. *Irvin v. Dowd*, 366 U.S. 717, 721 (1961). The guarantee was one of "a fair trial by a panel of impartial indifferent jurors." *Id.* at 722 (internal citation omitted). Lord Coke's commentary, published in 1628, speaks to this understanding: "He that is of a jury, must be … only a freeman and not bond, but also one that hath such freedoms of mind as he stands **indifferent as hee stands unsworne**." Edward Coke, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 155d (14th ed. Brooke, 1789) (emphasis added).

The right to trial by jury is enshrined in Article III, Section 2 of the United States Constitution, which provides that "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury[,]" U.S. CONST. Art. III, § 2, and in the Sixth Amendment's guarantee of "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[,]" U.S. CONST. amend. VI.[9] In speaking of the guarantee of a "fair trial by a panel of impartial, 'indifferent' jurors[,]" the High Court has remarked that the "failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin*, 366 U.S. at 722.[10]

"The theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145 (1878). Thus, our adversarial system requires that a prosecutor meet the "burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure[,]" circumstances which are wanting "if the jury which is to sit in judgment of a fellow human being comes to its task with its mind ineradicably poisoned against him." *Irvin*, 366 U.S. at 729 (Frankfurter, J., concurring). In identifying the level of partiality that disqualifies a juror, the High Court has called upon Chief Justice Marshall's opinion, issued in Aaron Burr's trial for treason, in which he remarked that the "great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F.Cas. 49, 50 No. 14692G (C.C.Va. 1807); cited by *Reynolds*, 98 U.S. at 155, *Irvin*, 366 U.S. at 722 & n.3, and *Ham v. South Carolina,* 409 U.S. 524, 531 (1973)

---

[9] Likewise, Article I, Section 9 of our Constitution enshrines the right to a "speedy public trial by an impartial jury of the vicinage." PA. CONST. art. I, § 9. We have said that "[t]o sustain the right three elements must meet—a speedy trial, an impartial jury, and one coming from the vicinage. If any of these be omitted, the accused's constitutional right is not complete." *Commonwealth v. Reilly*, 188 A. 574, 579 (Pa. 1936).

[10] "The right to an impartial jury is guaranteed by both the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, and by principles of due process." *Turner v. Murray*, 476 U.S. 28, 36 n.9 (1986) (internal citation omitted).

(Marshall, J., concurring and dissenting). Chief Justice Marshall observed that a juror is not automatically disqualified for having "light impressions" but "those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him." *Burr*, 25 F.Cas. at 51.

Thus, to effectuate their right, litigants are entitled to examine prospective jurors to unearth disqualifying states of mind. *See, e.g.*, *Aldridge v. United States*, 283 U.S. 308, 313 (1931) (referring to the right to examine jurors with respect to racial, religious and other prejudices of a serious character). As Justice Marshall wrote, "the right to an impartial jury carries with it the concomitant right to take reasonable steps designed to insure that the jury is impartial[,]" which is given meaning by the accompanying "right to ask relevant questions on voir dire upon which the challenge for cause can be predicated." *Ham*, 409 U.S. at 532 (Marshall, J., concurring and dissenting). "Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury." *Dennis v. United States*, 339 U.S. 162, 171-72 (1950).

Much of this Court's case law deals with specific voir dire questions related to readily discernible and recognized prejudices: racial bias and the official status of certain witnesses. In *Brown*, 347 A.2d 716 *overruled, in part, by Richardson*, 474 A.2d 1361, the Court held that it was error to refuse to ask the venire, "Would you, or do you, get upset or take special note when you see a white girl and a black man walking together; talking together; holding hands?" *Brown*, 347 A.2d at 717. The Court relied on *Ham*, where a defendant requested questions regarding whether the prospective jurors could "fairly try this case on the basis of the evidence and disregarding the defendant's race;" whether they would disregard the fact that the defendant wears a beard; and whether they watched a television show regarding a local drug problem. *Ham*, 409 U.S. at 526 n.2. As to the

first question, the High Court held that the Fourteenth Amendment required the judge to inquire into racial prejudice, although it "was not required to put the question in any particular form, or to ask any particular number of questions on the subject." *Id.* at 526-27. Because there was no such inquiry, the case was remanded for a new trial. However, as to the question about beards, the Court stated that "[g]iven the traditionally broad discretion accorded to the trial judge in conducting voir dire, … and our inability to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices, we do not believe the petitioner's constitutional rights were violated when the trial judge refused to put this question." *Id.* at 528. Likewise, the Court found no error in the trial court's refusal to ask about the pretrial publicity regarding the local drug problem because the record contained no evidence substantiating such publicity. *Id.*

The *Brown* Court reiterated the High Court's determination in *Ham* that the Fourteenth Amendment, in ensuring the essential demands of fairness, required the trial judge to allow inquiry into the subject of racial prejudice. In *Brown,* a white female testified that she was exiting a McDonald's where she had bought food for herself and her friend when Brown and a companion forced her and her friend into a car and sexually assaulted them. Our analysis in *Brown* was relatively brief. We stated that, under the facts, the inquiry requested was "relevant," and the question was "proper in that it was designed to elicit a response that would subject a juror to disqualification for cause." *Brown*, 347 A.2d at 717 (internal quotation marks omitted). Specifically, it was "designed to elicit the prospective jurors' bias or prejudice concerning black-white relationships which, if shown, would subject them to disqualification." *Id.* at 718. We rejected the Commonwealth's argument that the question was a hypothetical based on the facts which the defense

would attempt to prove. Therefore, the *Brown* Court held that the trial court erred in refusing the question.

In *Richardson*, this Court was again faced with a request for a specific inquiry into racial bias. Addressing a rape of a white woman where the accused was a black man, the *Richardson* Court considered the adequacy of voir dire. *Richardson*, 473 A.2d at 1363. The trial court specifically told the jury that the victim was white and the defendant was black, and then asked, "Would these racial differences present such a problem to you that it could interfere with your honest appraisal of the case and interfere with your ability to be completely fair to both the Commonwealth and the [d]efendant?" *Id.* at 1362. The trial court declined the defendant's five additional questions regarding whether potential jurors were "prejudiced in any way against black people;" whether they would have difficulty being fair because the defendant was being charged with raping a white woman; whether potential jurors believed black people were more dishonest than white people; whether they believed that black men liked to rape white women; and whether they would tend to believe the complainant because she was white. *Id.*

The *Richardson* Court emphasized that the scope of voir dire is a matter within the trial court's discretion and that its rulings "must be considered in light of the factual circumstances of a particular episode, and, in a given case, circumstances may be presented which render the case racially sensitive, thus making it necessary to inquire into racial attitudes of potential jurors." *Id.* at 1363. The Court contrasted more racially charged circumstances in *Christian*, 389 A.2d at 547-48 & n.6, where a black man was accused of rape and sexual molestation of an elderly white woman and the fact that he was Black was going to be emphasized at trial and *Brown*, 347 A.2d 716, with those involved in the case on review. Unlike *Christian* and *Brown*, the *Richardson* case was not one "infuse[d] … with enhanced racial sensitivity," and the racial differences were not

emphasized by evidence at trial. *Richardson*, 473 A.2d at 1363. It highlighted *Ham*'s qualification that a trial judge need not pose the question in any particular form to support the trial court's conduct of voir dire. *Id.* In emphasizing *Ham*'s qualification, the *Richardson* Court disapproved the "specificity of questioning required" in *Brown. Id.* at 1364 n.2.[11] The *Richardson* Court concluded that the trial court's explicit inquiry into possible racial bias was adequate and rejected the defendant's request for additional specific questions. *Id.*

In *Futch*, the status of witnesses was the focus of voir dire challenges. The case involved a first-degree murder conviction arising out of the stabbing of an inmate at the State Correctional Institution at Pittsburgh where both the victim and defendant were inmates. The Commonwealth's witnesses were prison guards and the defendant's witnesses were prisoners. This Court reviewed the trial court's refusal to ask four questions requested by the defendant, Futch:

> (1) Would the fact that all of Mr. Futch's material witnesses are incarcerated at Western Penitentiary make their testimony less believable than any witness that the Commonwealth may produce who are not prisoners?
>
> (2) Do you have any hostile feelings toward people who are in prison?
>
> (3) Would you give more credence to the testimony of a prison guard than you would to a prisoner, simply because he is a prison guard?
>
> (4) Would you give more credence to the testimony of a white person over that of a black person simply because he is a white person?

---

[11] The *Richardson* Court stated that "to the extent that the opinion in *Brown* can be construed as inconsistent with the views expressed herein, as to the specificity of questioning required, it is overruled." *Richardson*, 473 A.2d at 1364 n.2.

*Futch*, 366 A.2d at 248. After recounting the purpose of voir dire, we determined that refusal to allow question four regarding bias in favor of a white witness's credibility was not an abuse of discretion because the trial court allowed two other questions specifically inquiring whether prospective jurors had any experience with black persons that would affect their judgment or ability to be fair or impartial. *Id.* at 248 n.3. We explained, those two questions "were more than adequate to elicit any possible racial bias." *Id.* at 248.

Turning to the other proposed questions, we observed that we evaluate the correctness of denial of voir dire questions "in the light of the facts presented." *Id.* at 249. We recounted then-Judge (subsequently Chief Justice) Burger's characterization of voir dire in a case where the crux of the case was the credibility of witnesses who were military police officers and metropolitan police officers: "[W]hen important testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested." *Brown v. United States*, 338 F.2d 543, 545 (D.C. Cir. 1964). Then-Judge Burger wrote that refusal to allow the queries regarding the testimony from the officers was reversible error, and on remand, the lower court was instructed to inquire into "whether any juror would tend to give either more or less credence because of the occupation or category of the prospective witness." *Id.* In *Futch*, we distilled the rationale as follows: "[A]lthough it is likely that jurors might believe testimony of law enforcement officials solely by virtue of the group's official status, it is unreasonable for them to do so because official status is no guarantee of trustworthiness." *Futch*, 366 A.2d at 250.

Central to the case against Futch were two prison guards' eyewitness accounts of the stabbing, and five others prison guards who would testify to corroborate other details. *Id.* Because this was "the most critical aspect of the case," it was prejudicial not to permit

question number three which focused on "the predilection of a prospective juror to credit the testimony of a **prison guard** simply because of the guard's official status." *Id.* at 249-50 (emphasis added). In question one, Futch essentially sought to inquire into prospective jurors' bias against the trustworthiness of his witnesses based on their status as prisoners. This Court identified no authority requiring such a question as no case had addressed the need to inquire during voir dire into prospective jurors' bias against prisoners. Nonetheless, we stated that we found no significant distinction to be drawn between the risk of fixed biases with regard to law enforcement officers or prison guards and the risk of fixed bias with regard to prison inmates as witnesses. *Id.* at 250. With prisoners, "it is just as likely that jurors might attach less credit to their testimony, and it is just as unreasonable for them to do so because prior criminal activity is not necessarily a reliable indicator of untrustworthiness." *Id.* We concluded that questions one and three should have been allowed.[12] *Id.*

As illustrated in *Futch*, the court was open to recognizing a potential class of witnesses that could evoke a fixed bias as a matter of first impression even where the potential for a fixed bias is not obvious or intuitive. The party requesting a specific inquiry into fixed bias concerning such category of witnesses must demonstrate that jurors might attach more or less credit to the testimony of the category of witnesses based on their status and that it is unreasonable for them to do so because their status is not necessarily a reliable indicator of trustworthiness. *Futch*, 366 A.2d at 249-50. When important testimony is anticipated from a witness in such a category, the trial court must allow inquiry to expose the fixed bias. Depending on the response to the inquiry by members of the venire, a juror will be subjected to individualized questioning to determine whether

---

[12] We found that question number two regarding hostility toward prison inmates was aimed at the same target as question one but more closely tied to the facts and therefore, question one was adequate to elicit any possible bias or prejudice.

a disclosed bias is immutable. The process establishes the framework for challenges "for cause" and rulings by the trial court prior to empaneling the jury to decide the case.

Prior to the commencement of voir dire in the instant matter, Smith submitted a motion for supplemental oral questions of jurors in which he alleged that the standard questionnaire "is inadequate to identify prospective jurors who may harbor a bias or disability which implicates their qualifications to serve." Smith's Motion for Supplemental Oral Questions, and to Permit Parties to Conduct Follow[-]up Questioning of Jurors, ¶ 1. He described the general legal framework establishing the right to a fair and impartial jury and the need for voir dire into bias. Smith's Requested Supplemental Oral Juror Questions, ¶¶ 1-6. Pertinent to this appeal, Smith proposed that the trial court ask prospective jurors: "Are you more likely to believe the testimony of a child alleging sexual abuse because you could not believe a child could lie about sexual abuse?" *Id*. ¶ 2. During a conference, the Commonwealth objected to the question as an inappropriate opinion question and one that does not speak to a prospective juror's ability to be fair and impartial. N.T., 6/22/2021, at 8-9. Smith offered no support for the proposition that the inquiry addressed a fixed bias or prejudice. The trial court agreed with the Commonwealth. *Id.* at 10.

Underlying Smith's motion before the trial court was a bald assumption that there is a fixed bias that child victims of sexual abuse who testify are truthful. It is clear that the trial court did not find that such bias was obvious or intuitive. Smith made no attempt to persuade the trial court of the reasonable likelihood that such bias existed to counter the Commonwealth's position that the proffered question was designed for purposes other than eliciting bias.

On appeal to this Court, Smith articulates a hypothesis for why such bias may exist that has been recognized in other jurisdictions.[13] He argues that sex crimes perpetuated against children are emotionally charged, inflammatory societal issues. Referring to articles detailing the aftermath of the revelations of infamous child predators and the depth of hatred of the molesters, even in prison settings,[14] he proposes that the issue of child sex abuse is one that widely engenders strong reactions against those accused of sex crimes against children. Given the reaction to the abhorrent nature of the crime, there is a reasonable likelihood that jurors would hold the fixed belief that a child witness would not lie about being sexually abused. Smith's Brief at 17-18. Questioning jurors about this bias is, according to Smith, especially warranted where, as here, the child victims' testimony is uncorroborated.[15] *Id.* at 17. As previously discussed, Smith buttresses the identified bias in favor of the truthfulness of child victims of sexual abuse with studies that he alleges establish such bias. *See* supra p. 8.[16] He further emphasizes that generally questioning the jurors about their reaction to the nature of the crime and their ability to be fair and impartial was inadequate to uncover a disqualifying predisposition because it is unlikely that jurors would be alert to the prejudice unless asked. Smith's Brief at 24 & n.9. Finally, Smith argues that bias should not be conflated with credibility because credibility

---

[13] *See Mitchell v. State*, 321 A.3d 116 (Md. 2024).

[14] Brian Palmer, *Are Child Molesters Really the Most Hated People in Prison?*, SLATE (Nov. 15, 2011), https://slate.com/news-and-politics/2011/11/jerry-sandusky-out-on-bail-are-child-molesters-tormented-in-american-prisons.html; Holly McKay, *Pedophiles in prison: The hell that would have awaited Epstein if he'd stayed behind bars*, FOX NEWS (Aug. 21, 2019), https://www.foxnews.com/us/jeffrey-epstein-pedophiles-prison-hell.

[15] Smith did not ask for the jurors to be questioned on the uncorroborated nature of the testimony of the child victims.

[16] *See also Mitchell v. State*, 321 A.3d 116, 129-130 (Md. 2024) (discussing studies).

does not come into play when a juror holds an immutable position on the truthfulness of a child victim. *Id.* at 22-23.

While Smith propounds a developed argument here for the propriety of the proffered question about bias in favor of the truthfulness of child witnesses, he made no such attempt to convince the trial court. In fact, while he requested multiple supplemental oral juror questions, only one of those questions related specifically to child sex abuse, i.e., the question we now consider. *See* supra pp. 4-5 & n.4. The other questions related to sex abuse, sexual assault or domestic violence in general and thus provided no insight into the detailed and nuanced argument regarding question number two that he presents to this Court.

It is also pertinent that unlike the many cases cited by Smith from other jurisdictions where the question proffered here was allowed,[17] the Commonwealth in this case disputed the propriety of the inquiry. Here, the Commonwealth offered to the trial court the **only** argument relevant to the proffered inquiry, and it was in opposition to its propriety.[18]

---

[17] *People v. Maguire*, 956 N.Y.S.2d 635, 638 (N.Y. 2012); *State v. Good*, 43 P.3d 948, 956 (Mont. 2002); *State v. Reed*, 8 P.3d 1025, 1028 (Utah 2000); *Tran v. State*, 221 S.W.3d 79, 84 (Tex. App. 2005).

[18] Notably, in its reply brief before this Court, the Commonwealth does not engage with Smith's argument in support of the likelihood of a bias in favor of child abuse witnesses. Instead, the Commonwealth argues again that the question was designed to test Smith's trial strategy. Given that Smith did not develop the foundation for this question in the trial court, the Commonwealth had no obligation to respond here because this Court would not decide this mixed question of law and fact on appeal. Likewise, we express no opinion on the viability of Smith's argument supporting a finding of bias in the circumstances presented. In contrast, Justice Dougherty states that he is unconvinced that there is a fixed bias in favor of the trustworthiness of child sexual assault victims, citing the reasons that justify the need for competency hearings of children under the age of fourteen. Concurring Op. at 2 (Dougherty, J.). Competency relates to the "capacity of a witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth." *Commonwealth v. Delbridge*, 855 A.2d 27, 40 (Pa. 2003). Competency hearings are warranted because of concerns that certain (continued…)

In reviewing a trial judge's refusal to ask questions to expose a prospective juror's impermissibly strong and deep impressions, we apply an abuse of discretion standard. Thus, the question before us is whether in refusing to ask the proffered question, the trial court's decision overrides or misapplies the law, whether its judgment was manifestly unreasonable or the result of partiality, prejudice, bias, or ill-will. *Commonwealth v. Yale*, 249 A.3d 1001, 1007-08 (Pa. 2021) (citing *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000)). We conclude that on this record, the trial court did not abuse its discretion in refusing to question the jurors on the potential for any bias in favor of child victims in sexual assault cases.

---

individuals are "'incapable of perceiving accurately;'" unable to "frame and express intelligent answers;" incapable of observing and remembering what they observe; and lack sufficient understanding or "consciousness of the duty to speak the truth." *Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014) (quoting Pa.R.E. 601 and *Commonwealth v. Washington*, 722 A.2d 643, 646 (Pa. 1998)). The need for a competency determination is not based on a general societal perception that certain individuals will lie, but instead based on consideration of the individual's mental capacity. Moreover, the voir dire question as posed by Smith presumes that the child witness who will testify at trial is competent, and, as in every case, that the finder of fact is responsible for determining truthfulness during deliberations. *Washington*, 722 A.2d at 646 (stating that a child's competency is a threshold legal issue decided by the trial court whereas "assessing the truthfulness of a child witness is a function for the finder of fact when deliberating"). Thus, Smith's assertion of a fixed bias in this scenario is not inconsistent with the fact that these same witnesses are subject to competency hearings.

We were not asked to decide whether there exists a bias in favor of the truthfulness of child sex abuse witnesses, and we take no position on the legitimacy of the hypothesis that there is a bias in favor of the truthfulness of the testimony of child victims of sexual abuse (or their untruthfulness). We hold only that the trial court did not err in refusing to question the jurors on their potential bias in this case because of the lack of developed record and argument in favor of propounding the question. If, in a future case, a trial court is presented with a developed argument supporting voir dire on this issue along with pointed argument undercutting the existence of a fixed bias in this circumstance, any decision of the trial court will again be reviewed for an abuse of discretion. While Justice Dougherty is correct that trial courts "retain their discretion to refuse to specifically probe this line of inquiry during voir dire[,]" a trial court is only free to do so based on the record before it. Concurring Op. at 3 (Dougherty, J.).

While recognizing that the trial and Superior courts did not view this case as one concerning an inquiry into a fixed bias, we note two critiques of the lower courts' analysis and the Commonwealth's position. First, each can be read to say that inquiries designed to uncover bias are nothing more than instructions on witness credibility. This is incorrect. The existence of a bias precludes the exercise of an impartial determination of a witness's credibility. For example, a juror with a fixed opinion that law enforcement officers are trustworthy cannot reasonably make an open-minded decision on the credibility of the law enforcement officers as witnesses.[19]

Second, the permeating discussion of the alleged purpose of the inquiry into the potential bias in favor a child victim of sex abuse as an attempt to test the defendant's trial strategy is misplaced. The case law cited in support of the view that probing jurors for harboring immutable opinions in reality deals with testing evidence that will be admitted at trial. However, where the inquiry seeks to determine the existence of a bias in favor or against a certain class of witness, this secondary result of the question—testing the efficacy of the evidence that will be offered—is irrelevant. Again, using as an example a case involving a law enforcement officer as a witness, a juror's ability to impartially judge

---

[19] When dealing with fixed biases, general questioning and instructions regarding credibility are inadequate substitutes for specific questions. *See, e.g.*, *Commonwealth v. Christian*, 389 A.2d 545, 547 (Pa. 1978) (holding that questioning prospective jurors about whether their "dealings or experiences with Negro persons … might make it difficult for [them] to sit in impartial judgment in this case?" was inadequate to uncover racial biases of potential jurors because the question was not "sufficiently probing or specific to reveal prejudices which might have immediate bearing on the present case."). The Superior Court astutely recognized (albeit in the context of bias based on personal interests in the outcome of a case) that "there are times when jurors are not aware of their own disqualifications." *Capoferri v. Children's Hospital of Philadelphia*, 893 A.2d 133, 142-43 (Pa. Super. 2006) (en banc). Even where the general questions successfully mete out some disqualified jurors, specific questioning regarding a fixed bias may be necessary for others who are unaware of their own disqualifications. Regarding the trial court's general voir dire in this case, although some jurors were disqualified, no juror was disqualified for a view of the trustworthiness of child victim witnesses.

the witness's truthfulness is a critical qualifier for the juror regardless of the fact that the defendant's trial strategy hinges on the juror's acceptance or rejection of the witness's testimony. The purpose of an inquiry into the reasonable possibility of the existence of a bias is to ensure the defendant's right to an impartial jury under the circumstances of the case. The question is proper even though it will disclose the juror's view of the evidence offered by the law enforcement officer.[20]

In this case, however, the lower courts did not accept the possibility that a bias in favor of the truthfulness of a child victim of sex abuse was cognizable. Thus, to the extent that there may appear to be a conflation of credibility and bias or testing trial strategy with probing for an immutable opinion held by the jurors, we attribute the discussion to the fundamental fact that the lower courts did not discern the possibility of such a bias in favor of the child sex abuse victim as a witness. Again, based on the lack of a foundation supporting the existence of such bias, the trial court did not abuse its discretion in refusing this supplemental oral question.

## II. Sufficiency of the Evidence to Support Unlawful Contact with a Minor

Smith asserts that the evidence was not sufficient to support his convictions for unlawful contact with a minor, 18 Pa.C.S. § 6318, because he did not engage in the type of "contact" prohibited by General Assembly. In evaluating the evidence, the trial court reasoned that there was "ample evidence establishing that [Smith] verbally and nonverbally communicated with M.B. and A.G. for the purposes of engaging in sexual

---

[20] In *Commonwealth v. Walker*, we determined that the trial court did not abuse its discretion in allowing a question regarding prospective jurors' "inherent belief that a complainant's uncorroborated testimony alone, even if believed, can never be sufficient to support a conviction." *Walker*, __ A.3d at _, 2025 WL 2402237, at *10. A juror's answer to that question will inform the Commonwealth of the likelihood of prevailing based on the uncorroborated evidence of a witness. The fact that the question tests the evidence that will be presented by the Commonwealth does not make the question improper. The legitimate purpose of the question is to uncover jurors' fixed beliefs about the need for corroborating evidence in sexual assault cases.

conduct." Trial Court Opinion, 6/1/2022, at 6. Though it purported to require "communication," and cited certain statements that Smith made during the sexual assaults, the trial court largely focused on the physical acts of the assault to determine that the "contact" requirement of Section 6318 was met. *Id.* at 7-9. The Superior Court affirmed Smith's convictions for unlawful contact with a minor, and in so doing, emphasized that its case law had established that the crime "'focuses on communication, verbal or nonverbal, and does not depend on the timing of the communication.'" *Smith*, 2023 WL 4174154 at *4 (citing *Commonwealth v. Davis*, 225 A.3d 582, 587-88 (Pa. Super. 2019)) (emphasis omitted). The Superior Court concluded that Smith's instructions to each victim immediately before the sexual assaults were the "type of communication contemplated by the statute." *Id.* at *5.

Subsequent to the Superior Court's opinion, we decided *Strunk*, which held that Section 6318 "was intended to criminalize behavior not otherwise covered by the Crimes Code." *Strunk*, 325 A.3d at 532. We explained that Section 6318 "does not criminalize inappropriate touching of minors; other statutes accomplish that goal." *Id.* at 542. We stated that it "is perhaps best described as an anti-grooming statute" although this description is imperfect. *Id.* We concluded that Section 6318 "is intended to criminalize and punish communication designed to induce or otherwise further the sexual exploitation of children." *Id.* at 543. Far from black letter law, *Strunk*'s application of Section 6318 was bound by the facts of that case, and it left unanswered questions regarding the scope of Section 6318. For example, the Court's reference to Section 6318 as an "anti-grooming statute" left open the question of what communications, in context, constitute the act of grooming prohibited by the statute. We leave it to the lower courts to apply and further elucidate the meaning of Section 6318's prohibition with the benefit of briefing post-*Strunk*. Given our refinement of the sufficiency of the evidence required for convictions

under Section 6318, we vacate the Superior Court's decision on this issue and remand for it to address the sufficiency challenge in light of *Strunk*.[21]

**Conclusion**

We conclude that the trial court did not abuse its discretion in refusing to ask Smith's proposed voir dire question in this case. However, in light of our recent decision in *Commonwealth v. Strunk*, 325 A.3d 530 (Pa. 2024), we vacate the Superior Court's judgment and remand for reconsideration.

Chief Justice Todd and Justices Wecht and Brobson join the opinion.

Justice Dougherty files a concurring opinion.

Justice Mundy files a concurring and dissenting opinion.

Justice McCaffery did not participate in the consideration or decision of this matter.

---

[21] We granted review on April 9, 2024, briefing was completed in September, and we issued *Strunk* in October. With *Strunk*'s issuance, the nature of the issue on which we initially granted review changed. We decline to apply *Strunk* without any advocacy by the parties and without the benefit of an intermediate appellate court opinion that contemplates *Strunk*. Both briefing and intermediate appellate review serve important purposes by illuminating the issues and setting the parameters for our review, allowing us to issue more informed opinions.

Thus, we are merely vacating the Superior Court's judgment and remanding for reconsideration in light of *Strunk*. To remand in light of intervening case law is a relatively routine procedure. *See, e.g.*, *Chester Hous. Auth. v. Polaha*, 166 A.3d 1231 (Pa. 2017) (per curiam) (vacating the Commonwealth Court's order and remanding for reconsideration in light of intervening opinion); *Commonwealth v. Miner*, 27 A.3d 986 (Pa. 2011) (per curiam) (vacating the Superior Court's decision and remanding for reconsideration in light of intervening opinion); *Commonwealth v. Cupps*, 730 A.2d 960 (Pa. 1999) (per curiam) (same). Lest we risk unduly influencing the determination of the Superior Court, we typically dispose of these matters by per curiam order. Along those lines, we purposefully engage in cursory review. *But see* Concurring & Dissenting Op. (Mundy, J.) at 4-5 (criticizing Majority for engaging in a "cursory review").